UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DALE GRIFFITHS,                          )
                                         )
                    Plaintiff            )
                                         )
v.                                       ) Civil No.  05-125-P-H
                                         )
ALFRED CICHON, et al.,                   )
                                         )
                    Defendants           )

*Recommended Decision on Motion to Dismiss and/or for Summary Judgment*

Dale Griffiths, formerly in the custody of the York County Jail, has filed a 42 U.S.C. § 1983 action against multiple defendants claiming that his Eighth Amendment rights were violated during his stay at the jail.  Griffiths asserts that personnel at the jail responsible for assuring that he got adequate medical care were deliberately indifferent to his medical needs when Griffiths complained of needing treatment for broken/abscessed teeth and a broken hand.[1]  Defendants Alfred Cichon and Peter Abrahamsen have filed a motion to dismiss and/or for summary judgment (Docket No. 42) to which Griffiths has not responded.  For the following reasons I recommend that the Court grant summary judgment as to both Cichon and Abrahamsen.[2]

---

[1]      In Paragraphs 22 and 23 Griffiths also references an order for an x-ray of his spine that was never completed but, as I read the complaint allegations, Griffiths is not complaining of any injury from this omission.

[2]      The motion asks for dismissal of the complaint as against Abrahamsen, arguing that the only allegation against him is that he was the supervising physician for the area jails.  (Mot. Dismiss & Summ. J. at 6.)  In my view Griffiths's complaint allegation is sufficient to state a claim against Abrahamsen in his supervisory capacity.  See Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512-13 (2002); compare Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 151 (1st Cir. 2006) ("The court's analysis of supervisory liability and qualified immunity relied upon the appropriate standards because, although specificity is not required at the pleading stage, it is required at the summary judgment stage." (citing Swierkiewicz, 534 U.S. at 512))

*Discussion*

**T***he Summary Judgment Standard*

The defendants are entitled to a favorable summary judgment order only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [they are] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If the defendants meet their burden this court will grant the summary judgment motion unless Griffiths's presentation generates a genuine issue as to the presence or absence of material fact or facts; that is, that the evidence in the record is 'sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).  In evaluating whether a genuine issue is raised, the Court must view all facts in the light most favorable to Griffiths and give him the benefit of all reasonable inferences.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

However, because Griffiths has failed to place a single one of the defendants' facts in dispute I deem the properly supported facts as admitted, see Faas v. Washington County, 260 F. Supp. 2d 198, 201 (D. Me. 2003).  Griffiths's pro se status does not relieve him of his duty to respond, see Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y 2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment"), nor alter the Court's obligation to fairly apply the rules governing summary judgment proceedings, see Fed. R. Civ. P. 56; Dist. Me. Loc. R. Civ. P. 56.

***Eighth Amendment Standard***

Two United States Supreme Court cases frame the constitutional standard for a deliberate indifference claim: Estelle v. Gamble, 429 U.S. 97 (1976) and Farmer v. Brennan, 511 U.S. 825 (1994). Estelle provided that the Eighth Amendment protection places upon the government an "obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. at 103. The Court observed: "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." id.

In Farmer the Court directed its attention to articulating the standard a plaintiff must meet to hold a prison official liable for Eighth Amendment claims of the type framed by Griffiths. It identified two prongs. First, the deprivation alleged must be "objectively 'sufficiently serious.'" 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, under Farmer, the defendant must have a culpable state of mind, which means that the defendant was deliberate in his indifference to the inmate's health or safety. Id. If the course of treatment amounts, at the most, to no more than negligence or medical malpractice there is no constitutional violation. See Daniels v. Williams, 474 U.S. 327, 335-36 (1986) (noting that 42 U.S.C. § 1983 provides a right of action for civil rights violations and cannot be used to sue correctional officials for negligence).

***Griffiths's Complaint Allegations***

In his complaint allegations Griffiths asserts that he "was left untreated with a broken tooth and exposed nerves causing great pain and difficulty eating for thirty[-] eight days." (Compl. Statement of Claim ¶ 1.)  He alleges that he was left with a severely

3

abscessed tooth keeping him awake in extreme pain and making him very sick due to swallowing the infection that was being produced by the abscess.  (Id. ¶ 2.)  He contends that the medical staff was aware of this condition and the abscess went untreated for ten days.  (Id.)   Griffiths explains that on November 20, 2004, he submitted a medical request slip during the morning medication pass which stated that he had lost a filling and had exposed nerves that were causing him a lot of discomfort.  (Id. ¶ 10.) He asserts that he asked to be seen by a dentist as soon as possible. (Id.)   The next day he submitted another slip during the morning medication pass that stated that he was in a lot of pain from the tooth.  (Id. ¶ 11.)  On November 23, Griffiths alleges, he submitted another slip during the morning medication pass representing that he had been awake all night vomiting bloody acidy bile caused by the prescription of Tylenol and Ibuprofen (presumably prescribed for his mouth pain).  (Id. ¶ 12.)  On November 26, Griffiths states that he submitted another request slip indicating that he was left in extreme pain and it was a violation of his Eighth Amendment rights.  (Id. ¶ 13.)  On November 30, Griffiths represents, he submitted another slip, representing that he was vomiting acidy, bloody bile and that his stomach was not tolerating the Tylenol and Ibuprofen.  (Id. ¶ 14.)  On December 1, Griffiths submitted a medical request slip indicating that he was in a lot of pain due to exposed nerves in two broken teeth.  (Id. ¶ 15.)   The next day Griffiths submitted a medical request form in which he reflected that, gauging by the response that he had received from Physician Assistant Alfred Cichon  in response to his grievance on this subject, Cichon was exhibiting a complete disregard  for Griffiths's needs and that it was very unethical to leave him in pain.  (Id. ¶ 16.)

On December 17, 2004, Griffiths came out of his cell for an evening medication pass and he told Nurse Bentley that he had been up for three days and nights in extreme pain from his teeth.  (Id. ¶ 18.)  Griffiths asked to be taken to the hospital.  (Id.)  Bentley looked in Griffiths's mouth and told him that he had abscesses on the left and right side of his lower jaw with visible puss pockets.  (Id.)  Bentley told Griffiths that she would call Cichon.  (Id.)  Griffiths states that after being refused a request to call his wife by Sergeant Seamons, he punched his hand into a steel door twice and declared that they would have to take him to the hospital for the broken hand.  (Id. ¶ 19.)  Pepper spray was deployed by Seamons and Griffiths was taken back to his cell.   Within fifteen minutes Bentley returned to Griffiths's cell with an ice pack and three Ibuprofen and told Griffiths that Cichon would not approve an immediate hospital run, that his hand would be x-rayed at the jail on Monday (December 20), and a dental appointment would be discussed at that time.  (Id. ¶ 21.)

While there was some intervening treatment on his hand, Griffiths's complaint allegations represent that it was not until December 28, 2004, that he was taken to the dentist and one broken and abscessed tooth was removed.  (Id. ¶ 29.)  The other broken tooth was not removed until May 25, 2005.  (Id. ¶ 31.)  Griffiths complains that he had to wait over a month to have any dental treatment for his broken teeth and exposed nerves, fifteen days of which was after the abscess was visible to Bentley.  (Id. ¶ 32.)

With respect to his hand, in his complaint Griffiths admits that he intentionally punched his fist twice into a steel door on December 17, 2004, in an effort to force the jail to transport him to the hospital (where presumably he hoped for relief from his dental problems).  (Compl. Statement of Claim ¶ 19.)  The next day, on December 18, Griffiths

was seen by Roland Morin who ordered x-rays and prescribed one Vicodin three times a day.  (Id. ¶ 22.)  On December 20 an x-ray was taken of Griffiths's hand. (Id. ¶ 23.)  That evening, Griffiths was informed that the x-ray showed a fracture.  (Id. ¶23 B.)

Griffiths complains that he did not know until later that a December 22, 2004, off-site orthopedic appointment for his hand was canceled after the medical department was informed by Gallagher that there was no staff available to take him to the appointment.  (Id. ¶ 24.)  On December 23, during the evening medical pass, Griffiths alleges that he asked for an ace bandage or splint to stabilize the hand which was painful and the request was denied because he was in a maximum security unit and in this unit these items were not allowed.  (Id. ¶ 25.)  At this point Griffiths showed the nurse his hand and asked why his fingers were folding under each other at odd angles and the nurse told him that it might be due to the way he was holding his hand.  (Id.)

On December 27, 2004, Griffiths was taken to an outside medical provider and seen by a doctor.  X-rays were taken and the doctor explained that he had a separated fracture that would require surgery, a collapsed wrist, an old fracture, and arthritis.  (Id. ¶ 26.)  The doctor asked Griffiths when he had injured his hand and Griffiths told him that ten days had elapsed since his injury.  (Id. ¶ 27.)  According to Griffiths's complaint, the doctor told him that if Griffiths had seen the doctor sooner, before bone spurs had formed, things would have been a lot less complicated.  (Id.)  Griffiths was fitted with a half-cast and ace bandage and was told that the cast was not going to correct the fracture but it would provide support and ease the pain.  (Id.)  Griffiths was returned to the prison and maximum security with the half-cast and the ace bandage.  (Id. ¶ 28.)  Griffiths's follow-up appointment with the doctor was canceled and rescheduled due to Gallagher's

transport-staff shortage. (Id. ¶ 30.) Griffiths complains that it is "unjustified" that he would have to wait ten days for treatment of his hand fracture. (Id. ¶ 33.) He states that his hand is disfigured, he now needs surgery (id. ¶ 34), he could not use his hand for six weeks, and after over six months the injury still causes him great pain when writing or undertaking other activities (id. ¶ 35).

### Undisputed Material Facts

At all times relevant to the above-entitled action, Al Cichon was an independent contractor performing services as a Physician Assistant to Allied Resources for Correctional Health, Inc. (hereinafter "ARCH"), a corporation engaged in the business of supplying healthcare professionals to county correctional facilities in Maine. (Defs.' SMF ¶ 1.) Cichon has contracted to provide his services as a Physician Assistant to ARCH since 1992. (Id. ¶ 2.) Prior to 1992, Cichon worked in the emergency departments of a number of Maine hospitals following a career in the United States Air Force as a medical technician and Physician Assistant. (Id. ¶ 3.) Cichon is certified by the American Board of PA Practice, has a B.S. degree as a Physician Associate and a Master of Public Administration degree. (Id. ¶ 4.) Cichon is registered with and licensed by the State of Maine to perform the services of a Physician Assistant. (Id. ¶ 5.) All Physician Assistants and/or nursing staff with whom ARCH contracts for services must have completed all necessary training to provide healthcare services, and must maintain appropriate licenses with the State of Maine. (Id. ¶ 6.)

Cichon treated Dale Griffiths at times as an inmate in the York County Jail beginning in 2004, and this treatment continued until Griffiths was sentenced to a term of incarceration in state prison in early January 2006, at which time Cichon's treatment of

7

him ceased. (Id. ¶ 7.) During the period that Griffiths was an inmate in the York County

jail, he reported subjective complaints of pain in his back, neck, wrist, hands, and teeth.

(Id. ¶ 8.).  Griffiths suffers from some degree of chronic arthritis in his hands, had surgery

on his hands in the past, and complained of post-surgical pain. (Id. ¶ 9.) In addition,

Griffiths intentionally broke his hand by punching a wall in December 2004 while an

inmate at York County jail, and then complained of post-traumatic pain related to that

event. (Id. ¶ 10.)

      Cichon's evaluations of Griffiths's hand complaints resulted in findings that

documented some degree of arthritis-related discomfort in his hands, but not at a level

that was consistent with his subjective complaints. (Id. ¶ 11.)  Cichon is also aware of at

least one incident in which jail corrections officers discovered Griffiths self-inflicting an

injury to his hand with a sharp object and then trying to have the wound become infected,

and he was complaining of pain at the wound site in an attempt to obtain narcotic pain

medication. (Id. ¶ 12.)

      Prior to his incarceration, Griffiths was being treated for pain complaints by his

own community physician, Dr. Stitzell.  (Id. ¶ 13.) Dr. Stitzell advised Cichon that he

became concerned that Griffiths, a man with a known history of substance abuse, was

seeking and abusing pain medications because of his addiction to such drugs. (Id. ¶ 14.)

During Cichon's course of treating Griffiths, Cichon discussed this addiction and

medication-seeking behavior with his physician, as part of his efforts to correctly assess

his subjective pain complaints and to prescribe pain medication that was appropriate to

Griffiths's situation.  (Id. ¶ 15.) In these discussions, which were conducted for purposes

of medical diagnosis and treatment, Dr. Stitzell informed Cichon that he would no longer

prescribe any potentially addictive medication for Griffiths because he repeatedly violated contracts with Dr. Stitzell to abstain from drug abuse. (Id. ¶ 16.)  The medical records from Dr. Stitzell that Cichon reviewed showed that Dr. Stitzell had also had ordered lab tests done on Griffiths and the results at times showed the presence of prescription drugs for which Griffiths had no prescription. (Id. ¶ 17.) Conversely, at times the test results did not show the presence of drugs for which Griffiths did have a prescription, leading to concerns about what he might have done with drugs he was prescribed and given, but had apparently not taken. (Id. ¶ 18.)  Copies of these lab results are present in Griffiths's medical file in York County Jail, which Cichon reviewed as part of his treatment of him because they contain information upon which a Physician Assistant would normally rely in formulating an opinion about a patient's medical condition and his possible need for prescription medication.  (Id. ¶ 19.) Dr. Stitzell advised Cichon that he had tried to have Griffiths treated at a pain clinic, with the goal of treating his pain complaints without potentially addictive narcotics, but that Griffiths did not keep appointments made for him at the pain clinic. (Id. ¶ 20.) Griffiths also did not keep two appointments at a pain clinic which Cichon made for him, though this was the result of transportation problems at the York County Jail over which Cichon had no control. (Id. ¶ 21.)

Griffiths filed numerous complaints and requests for medical treatments, all with the goal, Cichon believed, of obtaining narcotic pain medication. (Id. ¶ 22.) Cichon perceived Griffiths to be a highly manipulative individual who has been determined by his own physician to be an addict who exhibits drug-seeking behavior. (Id. ¶ 23.) According to Cichon, Griffiths is a known and self-admitted substance abuser who has

proven to be treatment resistant. (Id. ¶ 24.) Griffiths became disruptive and even violent when his requests for prescription pain medications were denied. (Id. ¶ 25.)

Cichon prescribed non-steroidal anti-inflammatory medications and pain medicines which are not potentially addictive to treat the normally expected level of pain and discomfort related to chronic arthritis such as that with which Griffiths has been diagnosed. (Id. ¶ 26.)  The non-steroidal, anti-inflammatory medications clearly did not satisfy Griffiths and resulted in him filing numerous complaints against Cichon, filing constant requests for medical intervention, seeking referrals to other doctors who had not yet refused to prescribe him potentially addictive pain medication, exhibiting further drug seeking behavior, and purposely injuring himself with the hope of obtaining other pain medications. (Id. ¶ 27.)  In December 2005 Griffiths also refused to undergo his annual physical as a means to protest the denial of his repeated requests for narcotic pain medications. (Id. ¶ 28.)

These events and diagnoses made Griffiths's treatment challenging for Cichon, especially if the goal of not prescribing unnecessary and potentially addictive pain medication for a known drug addict/abuser was to be met. (Id. ¶ 29.) Cichon was committed to seeing that Griffiths received appropriate medical care, notwithstanding the multiple grievances he had filed against Cichon and the fact that Griffiths also sued Cichon. (Id. ¶ 30.) In rendering such treatment, however, Cichon was required to be guided by his objective findings in evaluating Griffiths and could not simply take at face value Griffiths subjective complaints of pain or allow himself to be manipulated by Griffiths for purposes of his obtaining narcotic medications. (Id. ¶ 31.) In Cichon's view, Griffiths, while admitting his drug addiction, was unwilling during the time Cichon was

10

involved in his treatment to face that issue and the role it was playing in his medical condition or to take the steps necessary to treat his addiction.  (Id. ¶ 32.)

Cichon works at other county jails in the State of Maine and Griffiths's medical records are the property of the York County Jail and for that reason, Cichon does not have copies of Griffiths's medical records to file with this court, but can confirm that records previously filed by York County in its objection to Griffiths's request for a Temporary Restraining Order, while not complete, accurately described his observations of Griffiths at various times, his consultations with Dr. Stitzell, and his treatment plan in Griffiths's case.  (Id. ¶ 33.)

Unless there was objective proof of some condition that required that Griffiths be provided potentially addictive pain medications, Cichon had to refrain from prescribing them to him because of Griffiths's history of drug addiction, drug abuse, and drug-seeking behavior. (Id. ¶ 34.)  Cichon did prescribe non-addictive pain medication, however, such as the Ultram which Griffiths was taking while under his care prior to being transferred to state prison. (Id. ¶ 35.) Griffiths was never denied appropriate pain medication, he was only denied potentially addictive narcotic pain medication, for the reasons previously stated.  (Id. ¶ 36.)

Cichon made an appointment for Griffiths to be seen at the Southern Maine Medical Center Pain Management Clinic on November 16, 2005, but Griffiths was unable to keep that appointment due to jail transportation problems. (Id. ¶ 37.) As a result of the jail transportation problems, Cichon had to reschedule Griffiths to be seen at the pain clinic on November 28, but that appointment also was missed due to jail transportation problems over which Cichon had no control.  (Id. ¶ 38.) When Cichon tried

to schedule Griffiths a third time at that pain clinic, Cichon was advised they would no longer give Griffiths appointments or see him as a patient, as a result of the cancellation of these two prior appointments. (Id. ¶ 39.)

On January 5, 2006, Cichon spoke to a staff member of the pain clinic and tried to convince the clinic to reconsider this position and agree to see Griffiths or, failing that, to assist Cichon in securing him an appointment with another pain clinic. (Id. ¶ 40.) Cichon was advised the pain clinic would review his request, in light of the information Cichon provided regarding the reason Griffiths had missed his two scheduled appointments, i.e., transportation problems at the jail where he was an inmate. (Id. ¶ 41.)  In addition, on December 2, 2005, Cichon was able to schedule Griffiths for a consultation with a hand surgeon, Dr. Samuel S. Scott, on December 19, 2005. (Id. ¶ 42.) There was some delay in securing this appointment, but the reason for that was that multiple orthopedic surgeons were consulted, but all wanted the opportunity to review Griffiths's medical records, including x-rays, before deciding whether to agree to see him. (Id. ¶ 43.)

After examining Griffiths and reviewing his x-rays, Dr. Scott advised Cichon that there was no change in Griffiths' chronic arthritic condition and that no surgical intervention was immediately necessary. (Id. ¶ 44.) Dr. Scott further advised Cichon that, should Griffiths wish to consider surgical options, that could be done at some point in the future after his transfer to the state prison in Warren to serve a sentence of several years, which transfer was imminent. (Id. ¶ 45.) Dr. Scott also declined to prescribe the narcotic pain killers which Griffiths had been demanding. (Id. ¶ 46.)

In early January 2006, Griffiths was sentenced to a period of incarceration in state prison and was transferred from the York County Jail to state custody.  (Id. ¶ 47.) Cichon

has had no involvement in Griffiths's care after that time because the State of Maine has no contract with his company, ARCH, to provide medical care for state prison inmates. (Id. ¶ 48.) At all times during his period of treatment of Griffiths at the York County jail from 2004 to January 2006, Cichon sought to treat Griffiths appropriately for the mild arthritis he suffers from, a hand injury that was self-inflicted, and his many subjective complaints of pain of various types and repeated demands for narcotic pain medications. (Id. ¶ 49.) Cichon's treatment of Griffiths, however, required that Cichon take into account his history of drug abuse and addiction, including addiction to narcotic pain medication, his history of repeatedly failing to live up to contracts made with his community physician to refrain from drug abuse, the position of his own community physician that he would not prescribe him any narcotic pain medication, drug screening results that proved that prescribed pain medications were not being taken properly, and his own objective findings that were not consistent with Griffiths's subjective complaints of pain. (Id. ¶ 50.) While Cichon did not prescribe Griffiths the narcotic pain medications he demanded, Griffiths was not denied other types of pain medication. (Id. ¶ 51.) Cichon only prescribed non-narcotic pain medication that did not pose a serious threat of addiction if prescribed for someone like Griffiths, however, an approach that was the same as that of Griffiths's own community physician and the surgeon who consulted on his arthritic hand condition. (Id. ¶ 52.)

Under Maine law a Physician Assistant must work in concert with a supervising physician and Cichon's supervising physician regarding the treatment of York County Jail inmates, including Griffiths, is Dr. Robert Abrahamsen. (Id. ¶ 53.) Dr. Abrahamsen reviews all of Cichon's entries in inmates' medical charts to ensure appropriate treatment,

13

and this review included those detailing his treatment of Mr. Griffiths discussed above. (Id. ¶ 54.) In addition, because of the treatment problems posed by Griffiths's particular situation, Cichon spoke with Dr. Abrahamsen about Griffiths's treatment plan. (Id. ¶ 55.) Dr. Abrahamsen concurred in Cichon's treatment plan for Griffiths, including the decision to seek treatment for chronic pain complaints in a pain clinic rather than simply prescribing narcotic pain medications as Griffiths was demanding. (Id. ¶ 56.) This approach was also endorsed by Dr. Stitzell and Dr. Scott, two physicians with whom Cichon has no professional affiliation. (Id. ¶ 57.) Dr. Abrahamsen did not examine Griffiths himself during this period, but he was made aware of relevant findings from Cichon's examinations of Griffiths. (Id. ¶ 58.) Speaking with Cichon about Griffiths's treatment and reviewing Cichon's entries in Griffiths's chart represents the entire involvement of Dr. Abrahamsen in the treatment of Griffiths while he was incarcerated at York County jail. (Id. ¶ 59.)

### *The Absence of an Eighth Amendment Violation on this Record*

The above undisputed material facts do not support a conclusion that Cichon violated Griffiths's Eighth Amendment rights, and neither he nor Abrahamsen, see Whitfield v. Melendez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) ("Absent direct participation, a supervisor may only be held liable where '(1) the behavior of [his] subordinates results in a constitutional violation.'"), can be held liable in this action.

In sum, prior to his incarceration, Griffiths was being treated for pain complaints by his own community physician, Dr. Stitzell. Dr. Stitzell advised Cichon that he became concerned that Griffiths, a man with a known history of substance abuse, was seeking and abusing pain medications because of his addiction to such drugs and that he had tried to

14

have Griffiths treated at a pain clinic, with the goal of treating his pain complaints without potentially addictive narcotics, but that Griffiths did not keep appointments made for him at the pain clinic.  Cichon did make two appointments at a pain clinic that Griffiths was unable to keep because of transportation problems at the York County Jail. On January 5, 2006, Cichon spoke to a staff member of the pain clinic and tried to convince the clinic to reconsider this position and he was advised the pain clinic would review his request. Without Griffiths having contravened the defendants' factual statement, this record also establishes that Griffiths was never denied appropriate pain medication but was only denied potentially addictive narcotic pain medication.

With respect to the hand injury, the record demonstrates that Griffiths fractured his own hand.  Cichon scheduled Griffiths for a consultation with a hand surgeon, Scott, on December 19, 2005.  There was some delay in securing this appointment, but the reason for that was that multiple orthopedic surgeons were consulted, but all wanted the opportunity to review Griffiths's medical records, including x-rays, before deciding whether to agree to see him. After examining Griffiths and reviewing his x-rays, Dr. Scott advised Cichon that there was no change in Griffiths's chronic arthritic condition and that no surgical intervention was immediately necessary and that, should Griffiths wish to consider surgical options, that could be done at some point in the future after his imminent transfer to the state prison in Warren to serve a sentence of several years.  Dr. Scott also declined to prescribe the narcotic pain killers which Griffiths had been demanding.

Finally, I note that Griffiths's statement of claim does include complaints about the lack of adequate response to his requests for dental treatment, that is in addition to the

issue of medication thoroughly addressed by the defendants' motion. (Compl. Statement of Claim ¶¶ 1-2, 10-21, 29, 31-32.)   In their motion on the topic of dental treatment, Cichon and Abrahamsen argue that Cichon would not prescribe different pain medication on December 17, 2004, due to Griffiths's medication history and that evening, after Griffiths broke his own hand, Cichon told Bentley - and Bentley relayed to Griffiths – that a dental appointment would be discussed on the following Monday. (Mot. Dismiss & Sum. J. at 4; Statement of Claim ¶ 21.)  The defendants point out that, per Griffiths's own complaint allegations, an appointment was made and a tooth removed on December 28. (Mot. Dismiss & Sum. J. at 4, 12; Statement of Claim ¶ 29.)  Curiously, the only statement of fact generated by these defendants concerning dental concerns is Paragraph 8 which acknowledges that (beginning in 2004) Griffiths complained of toothaches. Griffiths complaints regarding Cichon and dental care appear to be centered upon Cichon's failure to provide pain medication for his toothache, not Cichon's role in the claimed failure to receive dental treatment.  Cichon's undisputed material facts explain why he failed to provide pain medication and that explanation satisfies the Eighth Amendment concerns raised by Griffiths.

In sum, drawing all reasonable inferences in Griffiths's favor and assuming that the deprivations alleged by Griffiths are "objectively 'sufficiently serious,'" Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991), Griffiths has failed to generate a genuine question of fact as to whether Cichon had "a culpable state of mind" in that Cichon was deliberately indifferent to Griffiths's health. Id.

*Conclusion*

For the above stated reasons, I recommend that the Court **GRANT** Cichon and

Abrahamsen summary judgment on their motion (Docket No. 42).

<u>NOTICE</u>

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive
memorandum shall be filed within ten (10) days after the filing of the
objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

July 13, 2006

17